IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHRISTOPHER LOPEZ,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br><br>TRANSPORTATION WORKERS UNION<br>LOCAL 234, *et al.*<br><br>　　　　　*Defendants*. | CIVIL ACTION<br>NO. 16-05515 |

**PAPPERT, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　April 12, 2018

## MEMORANDUM

Christopher Lopez was a bus driver for the Southeastern Pennsylvania Transportation Authority ("SEPTA") and as such was a member of the Transportation Workers Union Local 234 ("the Union"). His rights were governed by a Collective Bargaining Agreement ("CBA") between the Union and SEPTA. SEPTA fired Lopez after he ran over a pedestrian, killing him, while driving his SEPTA bus.

Lopez sued SEPTA and the Union accusing SEPTA of breaching the CBA (Count I), alleging against the Union a breach of the duty of fair representation (Count II) and claiming that SEPTA and the Union violated his Fifth and Fourteenth Amendment due process rights (Count III). (ECF No. 9.) The defendants filed motions to dismiss which the Court granted in part; specifically, the Court dismissed Count I against SEPTA and Count III against the Union. (ECF Nos. 15, 16.) SEPTA and the Union subsequently filed motions for summary judgment with respect to the remaining claims, namely Count II which contends that the Union failed to adequately represent Lopez and take

1

his case to arbitration, and Count III which accuses SEPTA of failing to comply with certain procedural requirements under the CBA. (ECF Nos. 34, 35.) The Court heard oral argument on both motions on March 29, 2018 (ECF No. 46) and grants them for the reasons that follow.

I

A

Lopez was driving his SEPTA bus north on 11th Street in Philadelphia at 1:06 a.m. on July 7, 2015. (Union Mot., Ex. D ("Formal Hearing Answer.")) He stopped at the bus stop at 11th at Walnut Streets to let passengers board. (Formal Hearing Answer.) SEPTA cameras, positioned throughout the bus, captured what then took place. (Union Mot., Ex. C ("Video.")) Two passengers boarded the bus while another pedestrian remained outside of the bus's front doors with a cigarette in his hand. (*Id.* at 1:06:28–1:06:38.)[1] In the report that Lopez filled out on the day of the incident, he claimed that the pedestrian "seemed drunk" and when asked if he was getting on the bus "didn't respond." (Union Mot., Ex. B ("Plaintiff's Accident Report.")) Lopez later testified that because the pedestrian seemed drunk, he "made a safety call" and decided "not to allow [the pedestrian] access to the bus." (Union Mot., Ex. I ("Lopez Dep.") at 34:9-21.) In any event and for whatever reason, the pedestrian, carrying a white plastic bag, hesitated. Lopez closed the bus doors on the bag and began to drive away. (Video, at 1:06:40.) While the bus was moving, Lopez opened the doors, releasing the bag and the person holding it, who then fell down and was run over by the rear wheels. (*Id.* at 1:06:42-1:06:44.)

---

[1] The video begins at timestamp 1:05:04.

Philadelphia Police stopped Lopez several minutes later at 11th and Vine Streets. (*Id.* at 1:11:00.) The police asked Lopez if he was involved in an accident, to which Lopez responded that he didn't think so. (Plaintiff's Accident Report.) SEPTA Transit Police and the Philadelphia Police Department each investigated the incident and prepared reports. (Formal Hearing Answer.) Although the pedestrian died as a result of his injuries (Pl's Resp. in Opp. to Union, Ex. P-18 ("Medical Examiner Report")), Lopez was never criminally charged.

B

SEPTA accused Lopez of violating five of SEPTA's Bus Division Rules and two of SEPTA's Standard Operating Rules: BDR-210 (Prohibiting Vehicle Operation with Doors Open), BDR-51-3 (Vehicle Operating Responsibilities), BDR-203 (Reckless Driving), BDR-51-12 (Vehicle Operating Responsibilities), BDR-213-A-2 (Accommodating Passengers), ASR-12-B-3 (Accident/Incidents), and ASR-1 (Safety Requirement). (Union Mot., Ex. F ("Charge Sheet"); Ex. G ("Bus Division Rules and Authority Standard Rules.")) On July 28, 2015, SEPTA's Assistant Director of Transportation Tom Ropars presented these charges at an informal hearing, the first step in SEPTA's disciplinary grievance process. (Lopez Dep. at 80:6-9; Union Mot., Ex. H ("CBA.")) Union Section Officer Andre Jones represented Lopez at the hearing. (Lopez Dep. at 80:6-9.) Jones made several arguments, including that SEPTA failed to prove that Lopez did anything wrong, that SEPTA drivers had not been fired after other fatal accidents and that SEPTA failed to produce witnesses or police reports at the hearing. (Lopez Dep. at 80:17-81:21.) Jones also argued that the video footage from the incident was not clear and did not show that Lopez was driving recklessly. (Union

Mot., Ex. J ("Informal Hearing Union Defense.")) Jones further requested the decedent's toxicology report. (Formal Hearing Answer.) Although Ropars recommended Lopez's discharge (Charge Sheet), Lopez was "very satisfied" with the aggressive defense that Jones provided (Lopez Dep. at 82:1-4). The Union thereafter demanded a formal hearing. (Charge Sheet.)

The Union assigned Business Agent Tony Goins to represent Lopez at the formal hearing, step two in SEPTA's disciplinary grievance process. (Lopez Dep. at 103:1-104:3.) Lopez called Union Executive Vice President Brian Pollitt to speak to him about the assignment of Goins to his case. (*Id.*) Pollitt, who Lopez asserts had previously been amicable to Lopez, was allegedly "irate" and "hostile" during the phone call. According to Lopez, Pollitt told him that it was not proper to ask for Jones to represent him because business agents, not section officers, are permitted to represent members at formal hearings. (Union Mot., Ex. Q ("Jones Dep.") at 41:4-11; 41:20-42:5; Pl's Resp. in Opp. to Union, Ex. C ("Goins Dep.") at 22:22-23:4.)

The formal hearing took place on September 29, 2015 before Ropars and Senior Director of Transportation Thomas Marcucci. (Formal Hearing Answer.) Goins represented Lopez, though Jones and Union Vice-Chairman Lamont Waller also attended. (*Id.*) SEPTA Transportation Manager John Ammons explained that he did not witness the accident but had the opportunity to speak with Lopez afterwards; fellow Transportation Manager Gary Stanford stated that upon arriving at the scene of the accident, one of the witnesses refused to speak to anyone from SEPTA. (*Id.*) SEPTA cited the video footage from the bus cameras as confirmation of the propriety of the charges against Lopez and substantiation for his discharge. (*Id.*) Goins made many of

4

the same arguments made by Jones at the informal hearing: SEPTA was relying fully on a video that was not clear; the Union had not been provided with proper paperwork, including the victim's toxicology report; Lopez was not solely responsible for the accident; and that a SEPTA driver was not discharged as a result of a similar accident, resulting in a fatality, that took place at Broad and Oregon Streets. (*Id.*) At the conclusion of the hearing, Marcucci determined that "as a result of the egregious nature of [the] accident and the rules violations associated with it[,] the proposed discharge is warranted." (*Id.*)

On October 15, 2015, SEPTA and Union representatives participated in the third step in the disciplinary grievance process, the labor relations step hearing. (Union Mot., Ex. A ("Labor Step Answer.")) Goins again represented Lopez and SEPTA Manager of Labor Relations Shawna Rogers presided. (*Id.*) Goins argued that SEPTA failed to prove its case against Lopez because it provided redacted information in violation of the CBA, the rules that Lopez was charged with violating did not apply and SEPTA failed to provide the decedent's toxicology report. (*Id.*) In upholding Lopez's termination, Rogers explained:

> Toxicology report and redacted information aside, Mr. Lopez is responsible for the accident that resulted in a fatality. Mr. Lopez could have allowed the pedestrian to board the bus. The video from the bus clearly shows he closed the door on the pedestrian and continued to move the bus with the pedestrian running alongside of the bus. Mr. Lopez opened the doors to release the bag, while the bus was still moving, causing the pedestrian to fall and be run over by the rear right tires of the bus. Mr. Lopez's assertion that he was unaware of the contact made with the pedestrian is either a complete falsehood or gross negligence as Mr. Lopez is responsible for checking that all persons boarding his bus are clear of the doors before pulling away from the transit stop. Mr. Lopez operated his vehicle in a careless and reckless manner causing the death of a pedestrian and as a result discharge is warranted.

(*Id.*)

5

Pursuant to the CBA's grievance process, if the Union is not satisfied with the result from the labor relations step hearing, it may decide to refer the case to arbitration. (CBA, Article II, Section 202(a).) The Union chose not to do so in Lopez's case, a decision explained by Union President Willie Brown in his sworn declaration. (Union Mot., Ex. M ("Decl. of Willie Brown") ¶ 13.) Brown stated, *inter alia*, that he watched the video of the incident and determined that Lopez's conduct was egregious because he consciously and knowingly disregarded the well-being of the pedestrian. (*Id.* ¶¶ 13, 15, 16.) Additionally, Brown confirmed that Lopez violated several rules, including requiring drivers to ensure that all doors are properly closed and that nothing is wedged in the door before moving (BDR-210). (*Id.* ¶ 17.) He also reviewed prior cases where pedestrians were struck by buses and determined that Lopez's case was different because unlike the others, Lopez could see the pedestrian the entire time, as opposed to the other drivers who were unable to see the pedestrian "until it [was] too late." (*Id.* ¶¶ 14-15.) All of these factors, notably the video, led Brown to "reluctantly [come] to the conclusion that Operator Lopez's case was unwinnable." (*Id.* ¶ 13.)

The Union sent Lopez a letter informing him of its decision not to take his case to arbitration. (Union Mot., Ex. N ("Appeal Letter.")) The letter stated that if Lopez disagreed with the Union's decision, he had "a right to appeal" the decision and provided him with instructions on how to do so. (*Id.*) Lopez testified that he understood his right to appeal the Union's decision but that he chose not to. (Lopez Dep. at 141:23.)

II

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. *Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). A mere scintilla of evidence in support of the nonmoving party will not suffice; there must be evidence by which a jury could reasonably find for the nonmoving party. *Id.* at 252. Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

III

A

In Count II, Lopez contends that the Union breached its duty of fair representation by providing him inadequate representation motivated by political animus and by refusing to take his case to arbitration. The Union responds initially

that Lopez failed to exhaust his internal union remedies and is thus barred from litigating this claim in federal court. "It is…well settled that exhaustion of the available internal union remedies is a necessary requirement for a plaintiff to bring a suit against a union for breach of the duty of fair representation." *Csanadi v. Teamsters, Chauffers, Warehousemen and Helpers Local Union No. 773,* 463 F. Supp. 276, 281 (E.D. Pa. 1978) (citing *Goclowski v. Penn Central Transp. Co.*, 571 F.3d 747, 757 (3d Cir. 1977)). There are limited circumstances, however, where courts may excuse the failure to exhaust internal union remedies. *Faust v. RCA Corp.*, 657 F. Supp. 614, 619 (M.D. Pa. 1986) (citing *Clayton v. International Union*, 451 U.S. 679, 689 (1981)). Courts can exercise their discretion and excuse an employee's failure to exhaust internal remedies if the union officials are "so hostile to the employee that he could not hope to obtain a fair hearing," if the internal procedure would be inadequate, or if the internal procedure would unreasonably delay the employee's opportunity to seek judicial review. *Id.* at 620. The Third Circuit Court of Appeals has also instructed courts to look at the reasonableness of imposing the procedural bar under the circumstances. *Local Union No. 1075, United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO v. United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL-CIO*, 716 F.2d 182, 187 (3d Cir. 1983). In *Local Union No. 1075*, the Third Circuit affirmed the district court's decision to excuse the exhaustion requirement because the union had changed its position during the appeals process, the union's constitution did not require the grievant to appeal and the union's constitution was unclear as to what type of decisions could be appealed. *Id.* at 188.

In its letter telling Lopez that it decided not to take his case to arbitration, the Union informed him that he had a right to appeal the decision to the Union's Review Committee. (Appeal Letter.) Lopez testified that he understood this right but that he chose not to pursue it. (Lopez Dep. at 141:23.) Lopez never addressed his failure to exhaust his remedies in his Response to the Union's Motion, but his counsel did, for the first time, at oral argument. (Hr'g Tr. 24:1-26:7.) Counsel asserted only that the Court should excuse the exhaustion requirement because Lopez was "distraught" and was never given an instruction that he was *required* to appeal the Union's decision not to take the case to arbitration. (*Id*.) Although Lopez was not informed that he was required to appeal prior to bringing a lawsuit in court, unlike the situation in *Local Union No. 1075,* the Union never changed its position regarding whether it was going to pursue arbitration.

Moreover, the letter that Lopez received clearly explained that he had the right to appeal the Union's decision and provided him with the steps to do so. (Appeal Letter.) Further, Lopez testified that he understood his right to appeal but that he chose not to. (Lopez Dep. at 141:23.) Counsel's argument does not help Lopez's cause. Counsel argues that during the formal hearing, Lopez's Union representative told him that the formal hearing was not fair, that SEPTA was rubber stamping the process, and that the only place he would get a fair hearing is before a neutral arbitrator. (Hr'g Tr. 26:1-7; Lopez Dep. at 116:16-117:6.) Even after Lopez was told that his best chance to receive a fair hearing was to proceed to arbitration, he decided not to appeal the Union's decision. There is no basis upon which to excuse Lopez from failing to exhaust

9

his internal union remedies and his claim against the Union is barred on that ground alone.

B

Even if Lopez were excused from the exhaustion requirement, he cannot show that the Union breached its duty of fair representation. "A union bears a duty of fair representation to the members of the bargaining unit that it is certified to serve." *Plouffe v. Gambone*, No. 11-6390, 2012 WL 2343381, at *9 (E.D. Pa. June 20, 2012). A union may breach its duty of fair representation if its actions are "arbitrary, discriminatory, or in bad faith." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). "To demonstrate bad faith, the plaintiff must show that the union had hostility toward plaintiff or the plaintiff's class and that the hostility negatively affected the union's representation of the plaintiff." *Danao v. ABM Janitorial Servs.*, 142 F. Supp. 3d 363, 371–72 (E.D. Pa. 2015). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is "so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n, Int'l*, 499 U.S. at 67.

When considering whether a union's actions fall within that wide range, courts "must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Id.* at 78. That standard "gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong," and even if its errors in judgment may rise to the level of negligence. *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45–46 (1998). When reviewing representation at a grievance hearing, courts must give "due regard for

the fact that both the advocates and the tribunal members are laymen," not lawyers. *Findley v. Jones Motor Freight, Div. Allegheny Corp.*, 639 F.2d 953, 961 (3d Cir. 1981). Nevertheless, a union must "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Marquez*, 525 U.S. at 44 (quotations omitted).

i

Lopez believes the Union harbored a "political animus" against him due to his support for certain people in prior elections. At the motion to dismiss stage, the Court pointed out that Lopez's complaint alleged no facts which could support his conclusory allegation that "the Union provided poor representation due to [Lopez's] choices in prior Union elections…." *Lopez v. Transportation Workers Union Local 234*, No. 16-05515, 2017 WL 2633468, at *5 (E.D. Pa. June 19, 2017). Nothing has changed at the summary judgment stage. In his Response to the Union's Motion, Lopez explains that Jones and Johnston ran for the position of Union President and Vice President against Brown and Pollitt and that Lopez supported the Jones and Johnston ticket. (Pl's Resp. in Opp. to Union, at 7.) Lopez claims that in retaliation for not voting for Pollitt in the election, Pollitt selected Goins to represent Lopez at the formal hearing and Goins in turn provided poor representation. Such unsubstantiated claims have been rejected in analogous cases.

In *Lopresti v. Cty. of Lehigh*, Kathleen Lopresti, a former corrections officer, sued her former union, alleging that it breached its duty of fair representation by withdrawing a grievance concerning her termination. 2013 WL 2449190, at *8. Specifically, Lopresti claimed that union members and representatives had a personal

11

animus toward her because of a mistaken belief that she was related to a member of the prison administration. The court granted the union's motion for summary judgment, noting that Lopresti only made "vague assertions that unidentified union members" held the mistaken belief and that she failed to show that union members had personal animus towards her because of that knowledge; even if she had shown a personal animus, there was no evidence that any alleged hostility impacted the union's decision to withdraw the grievance. *Id.*

Similar to Lopresti, Lopez makes a vague assertion "that everyone knew" he "backed Andre Jones and the Jack Johnston ticket in the union elections" instead of the Brown and Pollitt ticket. (Lopez Dep. at 102:14-18.) That contention is not sufficient to establish that Pollitt or Goins knew who Lopez voted for. In fact, there is no record evidence that Pollitt knew who Lopez supported, and Goins testified that he did not know who Lopez voted for. (Goins Dep. at 14:15-15:3.) Even if Lopez could show that Pollitt knew Lopez's political preferences, Lopez's claim would still fail. Lopez contends that when it came time to prepare for the formal hearing, he asked Pollitt if Jones could represent him. (Lopez Dep. at 103:1-104:3.) Pollitt, who had allegedly been amicable to Lopez before union elections, was purportedly "irate" and "hostile" during the phone call. (*Id.*) Even if that were the case, there is no evidence that it impacted Pollitt's decision to appoint Goins. In fact, both Jones and Goins testified that only business agents were allowed to represent members at formal hearings. (Jones Dep. at 41:4-11; 41:20-42:5; Goins Dep. at 15:9-11; 22:7-21.) Although Lopez claims that there is no written rule requiring business agents to represent members at formal hearings, he has

presented no evidence suggesting that the decision was made in response to Pollitt's hostility towards Lopez.

Further, even if Goins' appointment was the result of Pollitt's hostility towards Lopez, Goins provided adequate representation at the formal hearing. Lopez argues that Goins was "woefully unprepared," but the record plainly refutes that assertion. During the formal hearing, Goins objected to SEPTA's contention that the video showed that someone was run over, argued that the video was grainy and unclear and criticized SEPTA for relying fully on a video to support the charges against Lopez when there was other evidence in the case. (Formal Hearing Answer.) Goins also argued that Lopez was not solely responsible for the accident and explained that another fatal accident did not result in the bus driver's termination. (*Id.*) Goins argued that police reports and the victim's toxicology report were never given to the Union, making it difficult to defend Lopez. (*Id.*; Lopez Dep. at 114:2-12.) In fact, Goins made the same arguments that Jones did at the informal hearing, and Lopez was "very satisfied" with the aggressive defense that Jones provided him. (Lopez Dep. at 82:1-4.) Additionally, Goins continued to advocate for Lopez after the formal hearing, voting in favor of bringing the case to arbitration after Lopez's discharge was upheld at step three of the review process. (Lopez Dep. at 140:4-10; Goins Dep. at 103:20-24.) In sum, there is no evidence to support Lopez's contention that Goins was unprepared or that he provided poor representation at the formal hearing.

ii

Lopez next alleges that the Union breached its duty of fair representation by refusing to take his case to arbitration. "[A] union has no obligation to arbitrate what it

13

deem[s] to be an unwinnable case," *Connelly*, 119 A.3d at 1135, and it may "abandon a grievance, so long as it does not act arbitrarily" or in bad faith, *Bazarte*, 429 F.2d at 872. "To demonstrate bad faith, the plaintiff must show that the union had hostility toward plaintiff or the plaintiff's class and that the hostility negatively affected the union's representation of the plaintiff." *Danao v. ABM Janitorial Servs.*, 142 F. Supp. 3d 363, 371–72 (E.D. Pa. 2015). There is no record evidence of hostility, deceitful action or dishonest conduct from which the Court could determine that the Union acted in bad faith when it decided not to arbitrate Lopez's claim. Further, the Union did not act arbitrarily because its decision was not "so far outside a wide range of reasonableness, that it is wholly irrational…." *Air Line Pilots Ass'n, Int'l*, 499 U.S. at 67.

SEPTA upheld Lopez's termination at step three of the disciplinary grievance process. In its Labor Step Answer, SEPTA explained its reason for doing so: "[t]oxicology report and redacted information aside, Mr. Lopez is responsible for the accident that resulted in a fatality." (Labor Step Answer.) The decision discussed Lopez's conduct as recorded in the video, explaining that he closed the door in the pedestrian's face, which caused the white bag he was carrying to get caught in the door. Lopez subsequently drove away with the bag lodged between the doors and the pedestrian holding onto the bag. Lopez then opened the doors to release the bag without stopping, causing the pedestrian to fall under the wheels of the bus. (*Id.*) The decision emphasized that Lopez's "careless and reckless" conduct, which violated seven Authority Standard and Bus Division Rules, resulted in his termination.

Union President Brown participated in the Union's decision declining to take Lopez's claim to arbitration. He reviewed supervisory reports of the incident, Lopez's

14

statement concerning the accident and SEPTA's Labor Step Answer. (Decl. of Willie Brown ¶¶ 4, 9, 13, 18.) He also reviewed the video footage numerous times to determine whether Lopez could succeed if the case went to arbitration. (*Id.* ¶ 13.) Brown "reluctantly" decided against taking Lopez's case to arbitration because, unlike other "knockdown" cases where SEPTA drivers only saw a pedestrian entering the bus's path once it was too late, the video showed that "Lopez *consciously and knowingly* disregarded the well-being of a pedestrian." (*Id.* ¶¶ 14-15 (emphasis in original)). Brown also explained that in addition to Lopez's "egregious" conduct, he violated well-established rules, including the rules requiring drivers to ensure that nothing is caught in a door and that individuals are clear of the doors before they are closed. (*Id.* ¶ 17.)

Lopez contends that notwithstanding the video, the Union should have taken his case to arbitration because SEPTA violated the CBA throughout the disciplinary grievance process. He claims that when making its decision, the Union "conveniently ignored" SEPTA's violations. (Pl's Opp. to Union, at 3.) Nothing in the record supports Lopez's claim. As Jones explained, just because SEPTA violates a provision of the CBA, it does not mean that the Union will decide to bring the case to arbitration; rather, it "depends on the circumstances." (Jones Dep. at 65.)

Lopez first argues that the Union should have taken his case to arbitration because SEPTA did not hold the formal hearing within ten days following his request, in violation of Article II, Section 201(B)(b)(1) of the CBA. (Pl's Opp. to Union, at 10.) Jones testified that it was not uncommon for the formal hearing to be held more than ten days after the request and that the Union never takes a case to arbitration because of a violation of the ten day rule. (Pl's Resp. in Opp. to Union, Ex. B, Jones Dep.

101:16-102:12.) Further, when asked why the Union didn't press the issue, Goins testified:

> I believe, from what I can recall, based on the information that wasn't given and Mr. Lopez was still on the payroll, we didn't want to push, that forward and have him go through the process and get rejected. My request was to have all relevant information prior to going to the hearing and we tried to give it some time and they never came up with it.

(Goins Dep. at 112:22-113:8.)

Lopez argues next that the Union knew that SEPTA failed to produce the pedestrian's toxicology report, which he claims is "exculpatory evidence." (Pl's Opp. to Union, at 4.) The CBA requires SEPTA to "provide copies of and review all the evidence *supporting the charges*." (CBA, Article II, Section 201(B)(a)(2).) SEPTA, however, never supported its decision to terminate Lopez by relying on a toxicology report. Further, the Union did not "ignore" this alleged violation. In his declaration, Brown explained that he and other Union staff reviewed the Labor Step Answer, which summarized Lopez's arguments at the labor relations step hearing, including his request for the toxicology report. The Labor Step Answer also contained SEPTA's explanation that Lopez was fired for violating operating rules and for operating the bus in a careless and reckless manner; the victim's sobriety or intoxication was irrelevant. The Union determined that Lopez's case was unwinnable for the reasons stated by Mr. Brown, particularly the video, which he viewed numerous times, "to determine how the case could be fought in the grievance procedure and whether the Union had a chance to win the case in arbitration." (Decl. of Willie Brown ¶ 13.) Having reviewed the video, the Court concludes that no reasonable juror could find that the Union's decision not to

proceed to arbitration despite SEPTA's alleged violation of the CBA was "so far outside the wide range of reasonableness as to be wholly irrational."

IV

In Count III, Lopez alleges that SEPTA failed to comply with the procedures outlined in the CBA during the disciplinary grievance process and the resulting procedural deficiencies violated his due process rights under the Fifth and Fourteenth Amendments.[2]

Public employment is a protected property interest when state law confers such interest by statute or contract. *See Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1398 (3d Cir. 1991). The Fourteenth Amendment prohibits states from depriving a person of life, liberty, or property without due process of law. *See* U.S. Const. amend. XIV, § 1. SEPTA is subject to suit under Section 1983. *See Burnette v. City of Philadelphia*, No. 13-0288, 2013 WL 1389753, at *5 (E.D. Pa. Apr. 5, 2013); *Reynolds v. Se. Pennsylvania Transp. Auth.*, No. 12-1008, 2013 WL 3939513, at *2 (E.D. Pa. July 31, 2013); *Pokalsky v. Se. Pennsylvania Transp. Auth.*, No. 02-323, 2002 WL 1998175, at *3 (E.D. Pa. Aug. 28, 2002). "[N]o single model of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause." *Dykes v. Se. Pa. Transp. Auth.*, 68 F.3d 1564, 1565–66 (3d Cir. 1995) (quoting *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 483 (1982)). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)). A public employer may satisfy its due process obligations by providing for facially adequate post-deprivation grievance procedures,

---

[2] A claim for violations of procedural due process against a state actor is properly brought under the Fourteenth, not Fifth, Amendment. *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000).

17

even if the decision resulting in the deprivation was biased. *Dykes*, 68 F.3d at 1571; *see also id*. at 1572 n.6 (collecting cases).

To "state a claim for failure to provide due process, a plaintiff must have taken advantage of the processes that are available to him or her, unless those processes are unavailable or patently inadequate." *Fralin v. Cty. of Bucks,* 296 F. Supp. 2d 609, 614 (E.D. Pa. 2003) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants." *Alvin*, 227 F.3d at 116. Further, when the claim is raised against a public employer and there was a grievance or arbitration procedure in place, those procedures satisfy due process requirements, "even if the hearing conducted by the Employer…[was] inherently biased." *Dykes*, 68 F.3d at 157 (citation omitted).

Lopez does not contend that the CBA's grievance process on its face violated due process. He argues instead that SEPTA violated his due process rights because it breached the terms of the CBA during the disciplinary grievance process. Specifically, Lopez claims that SEPTA failed to provide him with the pedestrian's toxicology report (Pl's Resp. in Opp. to SEPTA at 10), did not hold the formal hearing within ten days of his request and failed to present all of the witnesses that created reports at that hearing (*id*. at 3–4). The CBA provides a procedure to resolve disagreements that take place during the disciplinary grievance process. If, as here, there is a dispute that "involves the application, implementation, or interpretation of any of the provision(s) of the [CBA]," the Union may file a grievance with SEPTA's Labor Relations Department. (CBA, Article II, Section 201(A); Section 202(b).) SEPTA and the Union will then

participate in an informal meeting and if the disagreement is not resolved, the parties attend a Labor Relations Step hearing. (*Id.*) Again, if the Union is dissatisfied with the outcome at this stage, it can proceed to arbitration to resolve the issue. (*Id.*)

This process was not followed. While the Union objected to what Lopez cites as SEPTA's violations of the CBA throughout the disciplinary grievance process, *see supra* Section I(B), it did not formally grieve any aspects of that process. (Hr'g Tr. 58:7-24; 59:4-13.) The Union's informal objections did not constitute adherence to the grievance process in the CBA. *See Alvin*, 227 F.3d at 111 (barring plaintiff's procedural due process claim against his employer because although he "sent a battery of letters and complaints to several members of the UPitt faculty and administration, he did not comply with the two-step grievance procedure laid out in the faculty handbook, a procedure that, if complied with, would appear to provide due process"). The Union, "as the exclusive bargaining representative had the ultimate power to make a fair and responsible determination" whether to pursue the grievance procedure prescribed in the CBA and Lopez cannot prevail against SEPTA because Union did not do so. *Dykes*, 68 F.3d at 1571.

An appropriate Order follows.

                                                          BY THE COURT:

                                                          ***/s/ Gerald J. Pappert***
                                                          GERALD J. PAPPERT, J.